Argued and submitted December 1, 2008, reversed as to denial of motion for
directed verdict on intentional interference claim; remanded with instructions to
grant defendant's motion for new trial limited to punitive damages unless
plaintiffs agree to remittitur of punitive damages equal to three times their
compensatory damages; otherwise affirmed October 28, 2009

Michael WIEBER,
an individual;
and Intrepid Corporation,
an Oregon domestic business corporation;
*Plaintiffs-Respondents,*

*v.*

FEDEX GROUND PACKAGE SYSTEM, INC.,
a Delaware corporation,
*Defendant-Appellant,*

*and*

Bradley KLINE,
an individual;
Nancy Khut,
an individual;
and Laurie LaVigne,
an individual;

*Defendants.* Multnomah County Circuit Court
040909259; A135969

220 P3d 68

471-a

471-c

Robert K. Spotswood argued the cause for appellant. With him on the briefs were John A. Anderson and Anderson & Yamada P.C., and Michael T. Sansbury, Emily J. Tidmore, and Spotswood Sansom & Sansbury LLC.

Bruce L. Campbell argued the cause for respondents. With him on the briefs were Peter C. Richter, Heather K. Cavanaugh, and Miller Nash LLP.

Before Edmonds, Presiding Judge, and Armstrong, Judge, and Wollheim, Judge.

WOLLHEIM, J.

Edmonds, P. J., concurring in part, and dissenting in part.

## WOLLHEIM, J.

Defendant FedEx Ground Package Systems, Inc. (FedEx) appeals a judgment following a jury verdict in favor of plaintiffs Wieber and Intrepid Corporation on claims for breach of the covenant of good faith and fair dealing, fraud, and intentional interference with economic relations.[1] The judgment awards plaintiffs compensatory damages of $350,000 and punitive damages of $7 million. FedEx assigns error to the trial court's denial of its motions for a directed verdict on the fraud and intentional interference claims and to the trial court's denial of its motion for a new trial based on the excessiveness of the punitive damages award. We reverse the trial court's denial of the directed verdict motion on the intentional interference claim, affirm the denial of the directed verdict motion on the fraud claim, and conclude that the punitive damages award was grossly excessive under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

## I. FACTUAL BACKGROUND

We state the facts in the light most favorable to plaintiffs, because they prevailed before the jury. *Taylor v. Ramsay-Gerding Construction Co.*, 345 Or 403, 406, 196 P3d 532 (2008).

Plaintiffs entered into an independent contractor agreement with FedEx on July 29, 2002, under which plaintiffs agreed to pick up and deliver packages on behalf of FedEx from businesses and residences located within a designated service area. Under the terms of the agreement, plaintiffs incurred the obligation to purchase vehicles, hire drivers, and manage their operations within guidelines specified by FedEx. In exchange, FedEx paid plaintiffs for picking up and delivering packages within the designated service area.

The agreement had an initial term of three years, automatically renewable for successive one-year terms unless either party provided notice of termination at least

---

[1] Wieber founded Intrepid as its sole shareholder in 2003. Because it is unnecessary to distinguish between Wieber and Intrepid to resolve the issues presented on appeal, we refer to them collectively as "plaintiffs."

30 days prior to the expiration of any term. As relevant to this case, the agreement provided that FedEx could terminate the agreement without notice only "if the other party breaches or fails to perform the contractual obligations."

In addition, the agreement granted plaintiffs a "proprietary interest" in the customer accounts within the designated service area. Consistently with that proprietary interest, the agreement stated, "Provided Contractor is in good standing hereunder, Contractor shall * * * have the right to assign his/her rights and obligations hereunder to a replacement contractor acceptable to FedEx Ground." As FedEx was aware, contractors frequently sell those rights at a profit over their initial investments; in fact, FedEx's marketing materials advertise to prospective contractors that they may "resell the rights to their routes at an attractive profit."

Plaintiffs purchased rights to their designated service area from three other contractors for $20,000. Plaintiffs purchased a truck to service that designated area. Wieber viewed his relationship with FedEx as a long-term investment, and he had plans to expand his business relationship with FedEx.

In January 2004, plaintiffs sought to purchase rights to an additional service area, and FedEx approved that purchase. Plaintiffs paid $35,000 to obtain that additional service area and purchased a truck to handle that expansion. Plaintiffs began servicing that additional area in early February 2004. By that time, FedEx had documented several incidents in which plaintiffs did not provide adequate service under the agreement. Among those incidents were two motor vehicle accidents in late 2002, several failures to pick up customer packages, the loss of additional packages, and several other complaints from customers.

In late February 2004, FedEx received two customer complaints concerning plaintiffs' new service area. On February 25, 2004, Wieber and a FedEx manager, Kline, discussed those complaints. Wieber testified:

"I said, well, okay, what does this mean? Shall I sell my routes? And [Kline] said, oh, no, *your contract is not in jeopardy*. I heard him say, *you are at a fork in the road*. But

that's—that's the only time I ever heard the words 'in jeopardy' * * * in any form whatsoever."

(Emphasis added.) Later during the first quarter of 2004, FedEx documented several other issues relating to plaintiffs' service areas, including a problem with an improper driver release on February 27, a delivery in an unauthorized vehicle on March 1, a misdirected package on March 4, and a safety violation on March 9.

Meanwhile, on March 1, 2004, Kline met with a different independent delivery contractor, Sherer, and discussed the possibility of Sherer taking over plaintiffs' service area. On March 17, 2004, FedEx pick-up and delivery manager LaVigne submitted internal FedEx forms requesting that different contractors take over each of plaintiffs' two service areas. Those forms identified plaintiffs' service areas, indicated that the purpose of the requests was to replace a terminated contractor, and identified Wieber as the contractor being replaced. On March 18, 2004, FedEx's managing director Littleton approved both of those requests.

On March 23, 2004, Wieber spoke with FedEx manager Khut about the status of his agreement and updated her on the recent issues concerning his service areas. At that time, Wieber asked her, "[W]ors[t] case scenario, how much time would I have to sell my routes"? Khut replied, "[W]ell, it varies, but usually 30 to 45 days." FedEx admitted before trial that "independent contractors are generally not informed if their contract has been recommended for termination." On March 24, 2004, the day after his conversation with Khut, Wieber sought approval to purchase another cargo van.

Between March 31 and April 7, 2004, LaVigne told another contractor, Justin Jones, that plaintiffs' service agreement was going to be terminated, that FedEx would be willing to give Jones one of plaintiffs' service areas at no cost, and that Jones should not tell anyone of plaintiffs' pending termination.

On April 1, 2004, Kline submitted written paperwork requesting termination of plaintiffs' service agreement. On April 2, 2004, FedEx approved plaintiffs' March 24

request to purchase an additional cargo van. Plaintiffs purchased that van for $26,000.

On April 17, 2004, Littleton approved Kline's recommendation to terminate plaintiff's contract. On May 5, 2004, FedEx's contractor relations department approved the termination; on May 14, 2004, Kline was informed of that approval; on May 17, 2004, Kline notified Wieber of his termination, effective immediately.

## II. PROCEDURAL BACKGROUND

Plaintiffs sued, alleging eight claims for relief. Four claims were ultimately submitted to the jury: (1) breach of contract, (2) breach of implied covenants of good faith and fair dealing, (3) fraud, and (4) intentional interference with economic relations. Plaintiffs sought $2,928,391 in compensatory damages on all claims for relief. In addition, plaintiffs sought $11,713,564 in punitive damages on the fraud and intentional interference claims.

At the conclusion of plaintiffs' case-in-chief, FedEx orally moved for a directed verdict. On the intentional interference with economic relations claim, FedEx argued that plaintiffs had a proprietary interest in the customer accounts in their designated service area only before the contract was terminated. Thus, according to FedEx, plaintiffs had "no prospective business relationship with customers" in that service area after contract termination. On the fraud claim, FedEx argued that its statements that plaintiffs would be provided advance notice of contract termination and that plaintiffs' contract was not under immediate threat of termination were not false at the time that the statements were made. FedEx also argued that any reliance by plaintiffs on those remarks was not reasonable because the contract did not require advance notice for termination. The trial court denied FedEx's directed verdict motions on those claims.

The jury found in FedEx's favor on the breach of contract claim and in plaintiffs' favor on the remaining claims. The jury awarded compensatory damages of $350,000 and punitive damages of $7 million.

Following the verdict, FedEx moved for judgment notwithstanding the verdict, or, in the alternative, for a new

trial on the fraud and intentional interference claims. Along with the motion for judgment notwithstanding the verdict, FedEx moved for a new trial on the ground that the amount of the punitive damages award was grossly excessive under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The trial court denied FedEx's motions. This appeal followed.

## III. ANALYSIS

FedEx's arguments on appeal, as a practical matter, concern only the award of punitive damages. FedEx does not challenge the judgment in favor of plaintiffs on the claim for breach of the implied covenant of good faith and fair dealing or the award of $350,000 in compensatory damages that could have been based solely on that claim. Rather, FedEx challenges the court's rulings as to those claims that could have supported a punitive damages award, as well as the award itself.

The jury's award of punitive damages was based solely on its finding in plaintiffs' favor on the claims for intentional interference and fraud. FedEx's first two assignments of error challenge the trial court's denial of its directed verdict motions on each of those claims. Thus, if FedEx were to prevail on both of those assignments of error, we necessarily would reverse the award of punitive damages. At oral argument, FedEx conceded that, if it does not prevail on both of those assignments, an award of some amount of punitive damages would be permissible. Thus, alternatively, if FedEx does not prevail on one or both of the first two assignments of error, FedEx argues in its third assignment of error that the amount of the punitive damages award is grossly excessive.

We first consider whether the trial court erred in denying FedEx's motions for a directed verdict, and conclude that the trial court erred in denying FedEx's motion on the intentional interference with economic relations claim but did not err in declining to direct a verdict in FedEx's favor on the fraud claim. Accordingly, we then consider the punitive damages issue. In that regard, we conclude that the trial court erred in denying FedEx's motion for a new trial unless plaintiffs agree to remittitur.

## A. *First Assignment of Error: Intentional Interference With Economic Relations*

■ We begin with FedEx's first assignment of error, in which FedEx contends that the trial court erred in denying its motion for a directed verdict on plaintiffs' claim for intentional interference with economic relations. On review, we will affirm the trial court's denial of a motion for a directed verdict unless there is no evidence in the record to support the jury's findings on an element of the claim. *Handam v. Wilsonville Holiday Partners, LLC*, 225 Or App 442, 444, 201 P3d 920 (2009).

■ To prevail on a claim for intentional interference with economic relations, plaintiffs were required to prove six elements:

> "(1) the existence of a professional or business relationship (which could include, *e.g.*, a contract or prospective economic advantage); (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages."

*McGanty v. Staudenraus*, 321 Or 532, 535, 901 P2d 841 (1995).

On appeal, FedEx argues that the evidence at trial was insufficient to establish the second, third, and fourth elements of the intentional interference claim. FedEx argues that FedEx was not a third party to plaintiffs' proprietary interests under the contract because FedEx was a party to the agreement that created that interest, that FedEx was not a third party to plaintiffs' customer accounts because FedEx was a party to plaintiffs' relationship to those customers under the agreement, and that, to the extent that plaintiffs had a potential, ongoing relationship to customers in the service area after termination of the agreement, FedEx did not interfere with that ongoing relationship. Finally, FedEx argues that it did not act for an improper purpose or through improper means.

Initially, plaintiffs argue that FedEx did not preserve those arguments at trial. Plaintiffs assert that, to preserve as error a trial court's denial of a motion for a directed verdict, a defendant must identify the specific grounds and direct the court's attention to those grounds when it moves for the directed verdict. Plaintiffs contend that FedEx did not raise those grounds in its motion for a directed verdict. Rather, plaintiffs argue that FedEx first raised in its motion for judgment notwithstanding the verdict the grounds on which it now argues that the trial court should have directed a verdict. Plaintiffs observe that a trial court may not grant judgment notwithstanding a verdict upon grounds that were not previously asserted in a motion for a directed verdict, citing *Vancil v. Poulson*, 236 Or 314, 320, 388 P2d 444 (1964), *Hamilton v. Lane County*, 204 Or App 147, 152, 129 P3d 235 (2006), and *Kraemer v. Harding*, 159 Or App 90, 113, 976 P2d 1160, *rev den*, 329 Or 357 (1999). Consequently, plaintiffs assert, FedEx did not preserve its arguments on appeal, because FedEx first raised them in moving for judgment notwithstanding the verdict.

We agree that arguments made for the first time in a motion for judgment notwithstanding the verdict do not preserve an issue for appellate review. *Kraemer*, 159 Or App at 113; *Gardner v. First Escrow Corp.*, 72 Or App 715, 727, 696 P2d 1172, *rev den*, 299 Or 314 (1985). Accordingly, in determining whether FedEx preserved its argument that the trial court erred in denying FedEx's motion for a directed verdict, we consider only what FedEx argued in moving for a directed verdict.

We begin by considering whether FedEx preserved its argument that FedEx was neither a "third party" to any of plaintiffs' relationships and that FedEx did not "interfere" with any of those relationships. In moving for a directed verdict, FedEx argued:

"Your Honor, we've admitted [plaintiffs] had a proprietary interest certainly in his work area. He had that business relationship. He was entitled to it while he was under contract with the company. Once his contract was terminated, * * * he no longer had that right. His right with respect to the work areas, the routes, [and] the customers terminated upon termination of the contract.

"* * * * *

"There's no interference with the customer—any prospective customer relationship, your Honor * * *. There's no prospective business relationships with customers * * * beyond the term of the contract."

That statement explicitly identifies as a ground for the motion for a directed verdict that plaintiffs did not have a prospective business relationship with the customers in the service area after contract termination and that FedEx could not have interfered with that prospective relationship.

We conclude that that statement was sufficient to preserve the issue whether FedEx was a third party to any of plaintiffs' economic relationships that existed while plaintiffs were under contract with FedEx. FedEx's motion for a directed verdict gave the trial court an opportunity to consider and rule on the contention that plaintiffs' relationship with the customers in the service area arose under the terms of plaintiffs' contract with FedEx and that FedEx was, therefore, not a third party to those relationships. That argument also provided plaintiffs an opportunity to respond to the issue of the nature of plaintiffs' relationship with customers in the service area, and the record is fully developed on that point. For those reasons, we conclude that FedEx preserved for appellate review whether the trial court should have granted the motion for a directed verdict on the intentional interference with economic relations claim on the ground that FedEx was not a third party to any existing or prospective relationship between plaintiffs and the customers in the service area. Because, as discussed below, we conclude that that argument is dispositive of this assignment of error, we do not reach the issue whether FedEx preserved its other arguments on the intentional interference claim.

We turn to the merits. The tort of intentional interference with economic relations "serves as a means of protecting contracting parties against interference in their contracts from *outside* parties." *McGanty*, 321 Or at 536 (emphasis in original). The tort, therefore, allows a party to a contract that is breached by the other contracting party to seek damages from a third party that induced the other contracting party to breach that contract. *Id.* The tort thereby

protects the interests of a plaintiff from " 'intermeddling strangers.' " *Id.* at 537 (quoting *Wampler v. Palmerton*, 250 Or 65, 77, 439 P2d 601 (1968)).

■ Here, FedEx was not a third party to plaintiffs' relationships with the customers in the service area designated by FedEx and plaintiffs under their agreement. Plaintiffs' relationship with those customers was inextricably linked to plaintiffs' contractual relationship with FedEx: Plaintiffs picked up and delivered packages from those customers on behalf of FedEx under the terms of plaintiffs' agreement with FedEx. Plaintiffs did not present any evidence at trial that plaintiffs had any economic relationship with those customers outside of plaintiffs' contractual relationship with FedEx. In addition, plaintiffs did not present any evidence that plaintiffs had any continuing relations with those customers following the termination of plaintiffs' agreement with FedEx. Although plaintiffs claimed a proprietary interest in their customer accounts under the terms of their agreement with FedEx, plaintiffs' *rights* to those customer accounts did not survive the termination of the agreement with FedEx. There is no evidence in the record that would support a finding that FedEx was a third party to any of plaintiffs' economic relationships. The trial court therefore erred in denying FedEx's motion for a directed verdict on the intentional interference with economic relations claim.

B. *Second Assignment of Error: Fraud*

■ FedEx's second assignment of error contends that the trial court erred in denying its motion for a directed verdict on plaintiffs' fraud claim. To prevail on a fraud claim, plaintiffs were required to show by clear and convincing evidence:

> "(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; (9) and his consequent and proximate injury."

*Conzelmann v. N. W. P. & D. Prod. Co.*, 190 Or 332, 350, 225 P2d 757 (1950). Plaintiffs' claim alleges that FedEx made

three misrepresentations: (1) Kline's statement on February 25, 2004, that plaintiffs' contract with FedEx was "not in jeopardy"; (2) Khut's statement on March 23, 2004, that plaintiffs would be given "30 to 45 days" to sell their proprietary interests under the agreement prior to termination; and (3) conduct by FedEx that actively concealed from plaintiffs its plans to terminate plaintiffs without notice.

On appeal, FedEx argues that there was no evidence (1) that Kline's statement was false at the time that it was made; (2) that plaintiffs actually relied or had a right to rely on Khut's statement; or (3) that FedEx had a duty to disclose, or actively concealed, its plans to terminate plaintiffs' agreement without notice. Plaintiffs respond that the evidence was sufficient to send the claim to the jury. As explained below, we agree with plaintiffs.

We begin with Kline's February 25, 2004, statement that plaintiffs' contract was "not in jeopardy." FedEx argues that plaintiffs did not present any evidence that Kline's statement was false at the time that it was made. On that point, we agree with FedEx. According to Wieber's own testimony, Kline qualified his "not in jeopardy" statement by also informing Wieber that their relationship was "at a fork in the road." Within that context, Kline's statement unequivocally informed Wieber that plaintiffs' contract might become subject to termination but was not subject to imminent termination. No evidence was presented at trial that that statement, when viewed in its appropriate context, was false at the time that it was made. Accordingly, Kline's "not in jeopardy" statement did not support plaintiff's fraud claim.

Khut's statement, however, is different. That statement responded to Wieber's inquiry, "[W]ors[t] case scenario, how much time would I have to sell my routes?" Khut responded, "[W]ell, it varies, but usually 30 to 45 days." Viewed in the light most favorable to plaintiffs, Khut's statement was an assurance that, unless there were unusual circumstances, plaintiffs would be provided 30 to 45 days' notice in which to sell their proprietary interests prior to termination. FedEx admitted before trial that they do not generally inform contractors that agreements have been recommended for termination.

FedEx argues that a reasonable jury could not have found that Khut's response supported plaintiffs' fraud claim because (1) no evidence showed that plaintiffs actually relied on Khut's statement to plaintiffs' detriment and (2) plaintiffs had no right to rely on Khut's statement to the extent that it contradicted the contractual terms in the agreement between plaintiffs and FedEx. FedEx claims that plaintiffs did not produce any evidence of actual, detrimental reliance showing that plaintiffs ever intended to sell their proprietary interest in their agreement with FedEx. FedEx concludes that, because plaintiffs never had that intent, plaintiffs' intent was not altered by Khut's statement. Thus, according to FedEx, plaintiffs could not show that they were placed in a worse position as a result of the misrepresentation. For the reasons that follow, that argument is unpersuasive.

■ Direct evidence of reliance in support of a fraud claim is not required; a plaintiff may prevail on a showing that a reasonable inference of reliance can be drawn from the facts in evidence. *Strawn v. Farmers Ins. Co.*, 228 Or App 454, 470 n 9, 209 P3d 357, *rev allowed*, 347 Or 258 (2009). Here, the facts establish that (1) plaintiffs had the right to sell their proprietary interests under the service agreement; (2) Wieber was concerned that those rights could be in jeopardy when Wieber asked Khut on March 23, 2004, "[W]ors[t] case scenario, how much time would I have to sell my routes?"; and (3) the day after Khut assured Wieber that, under a worst case, Wieber would have 30 to 45 days to sell his interests, plaintiffs sought authority from FedEx to purchase another cargo van to use in servicing their routes, and FedEx authorized the purchase of that van. In addition, the jury could have reasonably inferred from Wieber's question to Khut that plaintiffs would have sought to sell their proprietary interests under the agreement but for Khut's assurances. Consequently, a reasonable jury could conclude on that evidence that, but for Khut's assurances, plaintiffs would not have purchased the cargo van to service their routes and would have otherwise sought to sell their proprietary interests under their agreement with FedEx. In sum, given our standard of review, the jury could have reasonably concluded that plaintiffs relied on Khut's misrepresentation

and were placed in a worse position as a result of Khut's misrepresentation.

█ We turn to whether plaintiffs had a right to rely on Khut's statement. The "right to rely" element of a fraud claim "requires proof of the reasonableness of the reliance." *OPERB v. Simat, Helliesen & Eichner*, 191 Or App 408, 428, 83 P3d 350 (2004). FedEx argues that plaintiffs' reliance on Khut's statement was not reasonable because Khut's statement contradicted the terms of the agreement between plaintiffs and FedEx. The agreement provides that each party may terminate the contract without notice if either party "breaches or fails to perform the contractual obligations imposed by this Agreement." The agreement also provides that it may not be "modified, altered, changed or amended in any respect unless in writing." As we understand their argument, FedEx contends that Khut's advance notice promise would have been an impermissible oral modification of the agreement. For that reason, FedEx asserts, plaintiffs' reliance on Khut's promise was unreasonable as a matter of law. We disagree.

As an initial matter, we do not agree with the predicate assumption that Khut's oral statement necessarily modified, altered, changed, or amended the agreement. Rather, when viewed in the light most favorable to plaintiffs, that statement conveyed that FedEx usually *waives* its contractual right to terminate without notice. Such a waiver would not contradict the terms of the agreement; in fact, FedEx admitted that "nothing in the FedEx Agreement or in the Contract Termination Guidelines *prohibited* FedEx from giving Wieber (Intrepid) 30 to 45 days' notice prior to his termination." (Emphasis added.) Thus, the issue here is not whether plaintiffs could have reasonably relied on a verbal alteration of the contract, but whether plaintiffs could have reasonably relied on Khut's statement that FedEx does not usually invoke its right to terminate without notice.

█ The standard for assessing reasonable reliance varies depending on the specific circumstances of the parties' relationship. We stated in *OPERB*:

"[R]easonableness is measured in the totality of the parties' circumstances and conduct. For example, if there is a naive and unsophisticated plaintiff on one side of the equation and an unscrupulous defendant who made active misrepresentations of fact on the other, a court might well conclude that, although a more sophisticated party would not have taken at face value the false representations of the defendant, *that* particular plaintiff was justified in doing so."

191 Or App at 428 (emphasis in original). Based on evidence that FedEx had a policy not to provide any advance notice to contractors prior to termination, a jury could determine that Khut's assurance constituted an "active misrepresentation of fact." A jury also reasonably could have found that, even if a more sophisticated party would not have relied on Khut's statement, plaintiffs in this case—who appeared to rely solely on FedEx's guidance to understand FedEx's policies regarding plaintiffs' rights to sell their proprietary interests and FedEx's termination procedures—were justified in so relying on Khut's statement. For those reasons, the jury reasonably could have found that plaintiffs' reliance on Khut's statement was reasonable under the circumstances.

In addition, plaintiffs contend that FedEx further perpetuated that fraud by actively concealing its intent to terminate the contract without providing an opportunity for plaintiffs to sell their proprietary interests. "Silence or nondisclosure can be the basis for a fraud action." *Caldwell v. Pop's Homes, Inc.*, 54 Or App 104, 113, 634 P2d 471 (1981). A party who makes a misleading misrepresentation assumes the obligation to make a full and fair disclosure of the whole truth. *Gregory v. Novak*, 121 Or App 651, 655, 855 P2d 1142 (1993). Moreover, even in the absence of a duty to speak, actions by a defendant to actively conceal the truth can constitute fraud. *Caldwell*, 54 Or App at 113.

As discussed, a reasonable jury could have concluded that Khut's assurance was a misleading misrepresentation. Viewing the evidence in the light most favorable to plaintiffs, the jury reasonably could have drawn the inferences that (1) FedEx actually concealed its plans to terminate plaintiffs

by instructing Jones not to tell Wieber of FedEx's plans to terminate plaintiffs' agreement; and (2) FedEx approved plaintiffs' investments in an additional cargo van at least in part to conceal FedEx's plans to terminate plaintiffs. Those acts of concealment also support plaintiffs' fraud claim.

In sum, the evidence was sufficient to support plaintiffs' fraud claim where FedEx made an active misrepresentation that plaintiffs would be given 30 to 45 days to sell their proprietary interests, where evidence supports a finding that plaintiffs reasonably relied on that misrepresentation, and where the evidence supports a finding that FedEx engaged in fraudulent concealment of its plan to terminate the agreement without advance notice. The trial court did not err in denying FedEx's motion for a directed verdict on the fraud claim.

## C. Third Assignment of Error: Punitive Damages

Because we conclude that the fraud claim was properly submitted to the jury, we reach FedEx's third assignment of error. That assignment challenges directly the punitive damages award. The jury awarded plaintiffs $350,000 in compensatory damages and $7 million in punitive damages. FedEx asserts that the punitive damages award was so grossly excessive as to constitute a violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and that the trial court, therefore, erred in denying FedEx's motion for a new trial.

As a predicate matter, we explain why our reversal on the intentional interference claim does not automatically entitle FedEx to a new trial on punitive damages. Where a jury verdict is based on multiple claims, and where one claim is supported by the evidence and another claim is invalid, an appellate court may reverse or modify the judgment only upon a showing that the jury verdict was based on the invalid claim rather than on the valid claim. *Shoup v. Wal-Mart Stores, Inc.*, 335 Or 164, 179, 61 P3d 928 (2003); *see also* ORS 19.415(2) ("No judgment shall be reversed or modified except for error substantially affecting the rights of a party."). The reasoning from *Shoup* applies to jury determinations of punitive damages. *Jensen v. Medley*, 336 Or 222, 241-42, 82 P3d 149 (2003). Here, the verdict form asked the jury to consider

whether punitive damages should be awarded in the event that the jury found in favor of plaintiffs on either the intentional interference or the fraud claims and, if so, to determine the amount of punitive damages. Based on that verdict form, FedEx cannot establish that the jury verdict on punitive damages was based on the intentional interference claim and not on the fraud claim. Accordingly, the invalidity of the intentional interference claim does not automatically entitle FedEx to a new trial on punitive damages. Rather, the issue becomes whether there is sufficient evidence to support the jury award of punitive damages based solely on the fraud claim.

■■ We review an award of punitive damages by resolving disputes regarding facts and factual inferences in favor of the jury's verdict and then determining whether the award on those facts and inferences violates the legal standard of gross excessiveness. *Vasquez-Lopez v. Beneficial Oregon, Inc.*, 210 Or App 553, 582, 152 P3d 940 (2007). Whether the award of punitive damages violates that standard is a question of law. *Id.*

■■ Our review of a punitive damages award involves three stages. *Goddard v. Farmers Ins. Co.*, 344 Or 232, 261-62, 179 P3d 645 (2008). First, we determine whether there is a factual predicate for the punitive damages award. *Id.* at 261. Second, we examine, as a matter of law, whether the award of punitive damages comports with due process when the pertinent facts are evaluated in light of the guideposts set out in *BMW of North America, Inc. v. Gore*, 517 US 559, 116 S Ct 1589, 134 L Ed 2d 809 (1996). *Goddard*, 344 Or at 261. Those guideposts are

> " '(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.' "

*Id.* at 251 (quoting *State Farm Mut. Automobile Ins. Co. v. Campbell*, 538 US 408, 418, 123 S Ct 1513, 155 L Ed 2d 585 (2003) (*Campbell*)). Third, if we determine that the award of punitive damages exceeds the constitutional limitations, we

apply those same guideposts to determine the "highest lawful amount" that a rational jury could award consistently with the Due Process Clause. *Goddard*, 344 Or at 261-62.

██ ██ We pause to review the constitutional basis for that standard of review. Article VII (Amended), section 3, of the Oregon Constitution provides, in part:

> "[N]o fact tried by a jury shall be otherwise re-examined in any court of this state, unless the court can affirmatively say there is *no* evidence to support the verdict."

(Emphasis added.) That constitutional provision severely restricts the authority of the courts to review the amount that the jury awards in punitive damages. Thus, unless there is *no evidence* in the record to support the jury's factual finding that punitive damages should be awarded, a court is barred under the Oregon Constitution from reviewing a jury's award of punitive damages. *Oberg v. Honda Motor Co.*, 320 Or 544, 549, 888 P2d 8 (1995), *cert den*, 517 US 1219 (1996) (citing *Van Lom v. Schneiderman*, 187 Or 89, 110-13, 210 P2d 461 (1949)); *see also Lakin v. Senco Products, Inc.*, 329 Or 62, 76, 987 P2d 463 (1999) (observing that Article VII (Amended), section 3, "eliminated Oregon trial courts' power to grant new trials for excessive verdicts"). Nonetheless, the Supremacy Clause of the United States Constitution binds Oregon courts to review jury awards of punitive damages to ensure compliance with a defendant's rights under the Due Process Clause.[2] *Oberg*, 320 Or at 549. Accordingly, our review of a jury's award of punitive damages is limited to two considerations: whether *any* evidence supports the jury's finding that punitive damages should be awarded; and whether the

---

[2] The Supremacy Clause, included in Article VI of the United States Constitution, provides:

> "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides:

> "No State shall * * * deprive any person of life, liberty, or property, without due process of law[.]"

amount of punitive damages is excessive in light of the Due Process Clause.

██ ██ Based on that constitutional framework, our standard of review is necessarily deferential to the jury's findings.

> "A jury's award of punitive damages shall not be disturbed when it is within the range that a rational juror would be entitled to award in the light of the record as a whole; the range that a rational juror would be entitled to award depends, in turn, on the statutory and common law factors that allow an award of punitive damages for the specific kind of claim at issue."

*Id.* at 549; *see also* ORS 31.730(2) (providing similar language). Under that standard of review, the court's duty is "not to redecide the historical facts as decided by the jury, but to decide where, for purposes of the *Gore* guideposts, the conduct at issue falls on the scale of conduct that does or *might* warrant imposition of punitive damages." *Goddard*, 344 Or at 262 (emphasis added).

Nonetheless, the dissent concludes that we may not offer plaintiffs the opportunity to remit the constitutionally excessive portion of the jury's award of punitive damages. The dissent reasons that "this court cannot segregate from the $7 million punitive damage award what amount of the punitive damages *should* have been awarded to plaintiffs as a matter of law." 231 Or App at 509 (Edmonds, P. J., concurring in part, and dissenting in part) (emphasis added). However, with respect, it is not the role of this court to decide anew the amount of damages that *should* have been awarded in this case.

██ Rather, it is our constitutional duty to determine, first, whether evidence in the record supports the jury's finding that punitive damages should be awarded and, second, any extent to which the amount of the punitive damages award is inconsistent with a defendant's rights under the Due Process Clause. As discussed below, FedEx concedes that evidence on the fraud claim supports the jury's finding that some amount of punitive damages should have been awarded. We agree with and accept that concession. The dissent does not appear to take issue with that concession. Thus, because evidence in the record supports the jury's finding

that some amount of punitive damages should be awarded, the Oregon Constitution does not provide authority for this court to further review the jury's award of punitive damages.

Our further review of the punitive damages award is, therefore, limited to what is required under the Supremacy Clause of the United States Constitution—that is, to review the *amount* of punitive damages for excessiveness under the federal Due Process Clause. Thus, we identify the highest lawful amount of punitive damages that a rational jury *could* have awarded consistently with the Due Process Clause and offer plaintiffs the opportunity to accept remittitur in that amount. With respect, the dissent does not articulate how our adherence to that methodology, as dictated by our standard of review and the appropriate constitutional framework, is erroneous. With that in mind, we proceed with our analysis.

1. *Factual Predicate for the Award of Any Punitive Damages*

At oral argument, FedEx conceded that, if we conclude that the trial court did not err in denying FedEx's motion for a directed verdict on the fraud claim, the fraud claim would establish a factual predicate for the punitive damages award. That concession comports with the relevant evidence as discussed in our analysis of the second assignment of error. Thus, at our first stage, we conclude that there is a factual predicate for a punitive damages award in some amount—*i.e.*, conduct that constitutes intentional fraud.

2. *Constitutionality of the Punitive Damages Award*

The second stage of our analysis examines whether the jury's punitive damages award of $7 million exceeds the level permissible under the federal constitution. In this stage of the analysis, we evaluate the punitive damages award against the guideposts identified in *Gore*. We begin with the second guidepost, which evaluates the punitive damages award against the actual or potential harm suffered by the plaintiffs, because that guidepost provides a rough numerical reference point. *See Goddard*, 344 Or at 259 ("Once that rough numerical reference point is established, the other guideposts come into play.").

For cases in which the injuries giving rise to a punitive damages award are purely economic, the federal constitution prohibits most punitive damages awards that significantly exceed four times the amount of the injured party's compensatory damages. *Id.* at 260. A higher ratio may be permissible under narrow circumstances, such as when a particularly egregious act causes only a small economic injury, when the injury is hard to detect, when the monetary injury for noneconomic harms is difficult to ascertain, or when "extraordinarily reprehensible" conduct is involved. *Id.* at 270.

In this case, the injuries suffered by plaintiffs were economic and not physical, and none of the narrow exceptions enunciated in *Goddard* applies. Consequently, our rough numerical reference point in this case is that the punitive damages award should be limited to no more than four times the plaintiffs' actual or potential damages.

To determine how that rough numerical point applies to this case, we must identify the denominator, *i.e.*, the amount of plaintiffs' actual or potential damages. FedEx argues, in a footnote in its brief to this court and a brief mention at oral argument, that the denominator should be $190,000.[3] That amount is what FedEx asserts is the value of plaintiffs' routes plus lost profits over a 45-day advance notice period. However, FedEx does not provide any explanation for why the jury, in reaching its verdict, was necessarily limited to finding damages of that amount. The verdict form did not specify the amount of compensatory damages awarded for each claim. The jury instructions did not specify how to calculate the amount of damages on the fraud claim. In short, nothing in the record shows how the jury actually calculated damages on the fraud claim. The amount of "the actual and potential harm suffered by a plaintiff is a fact to be decided by the jury." *Id.* at 268-69. We do not consider whether the jury could conceivably have awarded a higher amount of damages for actual and potential harm. *Id.* at 268. Similarly, we do not consider whether the jury could conceivably have awarded a lesser amount of damages where the record does not establish that the jury necessarily awarded

---

[3] At oral argument, FedEx stated that the denominator should be $189,000.

damages on the fraud claim in that lesser amount. Accordingly, FedEx's suggestion that the jury might have reduced the value of the damages attributable to the fraud claim is not a basis for us to disregard the damages that were actually awarded by the jury.

In contrast, plaintiffs argue that the denominator should be the total amount of compensatory damages alleged in the complaint, $2,928,391, which plaintiffs assert represents the value of plaintiffs' proprietary interests under the contract plus plaintiffs' lost profits. In making that argument, plaintiffs invite us to overturn this court's decision in *Hamlin v. Hampton Lumber Mills, Inc.*, 222 Or App 230, 242-44, 193 P3d 46 (2008), *rev allowed*, 346 Or 157 (2009), in which we determined that only the amount of mitigated damages attributable to a defendant may be used as the denominator for purposes of assessing punitive damages. We decline the invitation to overrule *Hamlin*. *See also Goddard*, 344 Or at 268 (stating that the concept of potential harm has "nothing to do with the amount that a jury *could* conceivably have awarded" (emphasis in original)).

Accordingly, we conclude that the jury's award of compensatory damages of $350,000 is the appropriate denominator for actual and potential damages. Using that denominator, the judgment of $7 million in punitive damages is 20 times the actual and potential damages relevant to this case. That ratio far exceeds our rough numerical reference point that punitive damages should be limited to four times the actual and potential damages. With that disparity in mind, we turn to the two other guideposts to evaluate whether it is appropriate to depart from our rough numerical reference point.

Under the first guidepost, we evaluate the degree of reprehensibility associated with FedEx's misconduct. This guidepost is the most important indicator of the reasonableness of a punitive damages award. *Gore*, 517 US at 575. To assess the degree of reprehensibility, we consider several factors: (1) whether a defendant's misconduct caused physical, as opposed to economic, harm; (2) whether a defendant's misconduct evinced a "reckless disregard of the health or safety of others"; (3) whether the target of the harm had "financial

vulnerability"; (4) whether the misconduct was composed of "repeated actions"; and (5) whether the harm resulted from "intentional malice, trickery, or deceit, or mere accident." *Goddard*, 344 Or at 253 (citations omitted).

■ We quickly address three of those factors. As discussed above, the evidence supports a verdict against FedEx on a claim for fraud. It directly follows from that verdict that the jury was entitled to find that FedEx's misconduct involved intentional trickery or deceit. Thus, the fifth factor of reprehensibility applies to this case. However, the first two factors plainly do not apply to this case, which involves purely economic harm. We turn to the remaining two factors.

■ The third factor of financial vulnerability depends upon whether a defendant had knowledge of a plaintiff's vulnerability and engaged in its misconduct despite that knowledge. *Id.* at 266. Here, between 2002 and 2004, plaintiffs invested $55,000 to purchase the rights it held in the two service areas, plus additional amounts to finance the purchase of cargo vans and related equipment used to perform its duties under the agreement. Wieber had sold his home and borrowed money in order to raise the capital for those investments. In return, plaintiffs received gross receipts from FedEx for providing services under the agreement of $154,532 and recorded a net operating loss, after expenses, of $4,256.

FedEx's termination of the agreement left Wieber without an opportunity to recoup that capital investment. It may be a reasonable inference that FedEx was aware that plaintiffs would lose their capital investments where FedEx had approved all purchases and sales of contractor's proprietary interest and was the sole source of income for plaintiffs' business. However, it is not a reasonable inference that FedEx knew that plaintiffs were financially vulnerable to those losses. No evidence shows that FedEx knew that Wieber had sold his home and borrowed money in order to provide the delivery services to FedEx under their agreement. In addition, no evidence shows that plaintiffs were incapable of absorbing the capital loss or that FedEx had any

knowledge of that incapacity. Consequently, FedEx's fraudulent misconduct was not reprehensible on the basis that it caused harm to an unusually financially vulnerable victim.

The fourth reprehensibility factor applies where "a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful." *Id.* (internal quotation marks omitted). This reprehensibility factor serves the policy purpose of allowing punitive damages at a level that could cause a defendant to cure a pattern of disrespect for the law. *Id.* Plaintiffs argue that FedEx engaged in a repeated course of misconduct against them, that FedEx concealed its intent to terminate other contractors without notice, and that FedEx's behavior, therefore, satisfied this fourth reprehensibility factor. On these facts, we disagree. FedEx's misconduct toward plaintiffs involved Khut's assurances of advance notice, FedEx's instructions to Jones not to tell Wieber of FedEx's termination plans, and FedEx's approval of plaintiffs' investments in an additional cargo van. All of that misconduct occurred within a two-month period of time and was related to one continuous course of fraudulent conduct. That evidence does not show that FedEx had a pattern of disrespect for the law. In addition, the slight evidence introduced by plaintiffs that FedEx failed to provide advance notice to other contractors does not support a finding that that failure was fraudulent with respect to those other contractors. *See also Campbell*, 538 US at 423 ("Due process does not permit courts * * * to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis * * *. Punishment on these bases creates the possibility of multiple punitive damages awards for the same conduct[.]" (Citations omitted.)). Consequently, FedEx's misconduct is not reprehensible on the basis that it engaged in repeated acts of misconduct.

Thus, the evidence establishes only one of the five factors of reprehensibility relating to FedEx's fraudulent misconduct. In *Hamlin, Vasquez-Lopez,* and *Strawn,* where two reprehensibility factors were present, we concluded that the misconduct described in each of those cases constituted "moderate reprehensibility." In each of those three cases, we concluded that the punitive damages award could not exceed a ratio of four times the amount of the actual and potential

harm. Furthermore, in *Goddard*, where the Supreme Court described the reprehensibility of the defendant's conduct in that case as extreme, that conduct justified "the highest permissible award, *viz.*, an award that is four times the amount of plaintiff's actual and potential harm." 344 Or at 276. In contrast, here, FedEx's misconduct is less reprehensible than in each of those four cases, but the jury award was 20 times the amount of plaintiffs' actual and potential harm. The level of reprehensibility associated with FedEx's misconduct does not justify an award of that magnitude.

■　　　We turn to the third guidepost, which examines comparable civil and criminal penalties, to conclusively determine whether the amount of punitive damages awarded in this case is constitutionally permissible. Plaintiffs assert that "FedEx's actions amount to aggravated theft by deception," ORS 164.085, and that that offense is punishable as a Class B felony under ORS 164.057. Theft is defined as the taking, appropriating, obtaining, or withholding of property from an owner. ORS 164.015. There is no evidence that FedEx took any property from plaintiffs; rather, plaintiffs' proprietary interests under the agreement were dissolved upon termination of the agreement. Plaintiffs do not cite any other comparable civil or criminal penalties, and, on our review of the record and the law, we do not find any. Thus, the third guidepost does not militate in favor of a punitive damages award that is 20 times the actual and potential harm caused by FedEx. For all the foregoing reasons, we conclude that the punitive damages award in this case is grossly excessive.

3. *The Maximum Punitive Damage Award Constitutionally Permissible*

　　　The final stage in our analysis determines the maximum punitive damages award that a rational juror could award consistently with the Due Process Clause. This analysis is guided by the same guideposts that we discussed in the previous section. *Hamlin*, 222 Or App at 248.

■　　　We again begin with the second guidepost in which we concluded that a four-to-one ratio approximates the outside limit on punitive damages in cases involving purely economic harm. *Goddard*, 344 Or at 275. Based on that ratio, we seek to determine an appropriate level of punitive damages

that recognizes that "cases involving roughly analogous circumstances, particularly with respect to the 'reprehensibility' variables, should yield roughly similar ratios of compensatory and punitive damage awards." *Id.* at 273.

At the outset, we note that, here, only one of the five reprehensibility factors is present. In contrast, in *Hamlin*, *Vasquez-Lopez*, and *Strawn*, two of the five reprehensibility factors were present, and, in each of those cases, we determined that the defendant's misconduct could be fairly characterized as moderately reprehensible. Thus, where FedEx's misconduct is less than that described in those three cases, we determine that FedEx's misconduct is fairly characterized as having a lesser level of reprehensibility.

With that characterization in mind, we turn to *Hamlin*, *Vasquez-Lopez*, and *Strawn* as benchmarks for determining the maximum permissible level of punitive damages appropriate in this case. However, because the reprehensibility of misconduct in this case is less than the reprehensibility in those cases, the appropriate ratio of the compensatory and punitive damage award here should also be less than the ratio awarded in those cases.

In *Vasquez-Lopez*, the defendants were found to be predatory lenders who committed fraud by inducing the plaintiffs to borrow money at extremely disadvantageous interest rates. 210 Or App at 556. In that case, we concluded that the actual and potential damages were $326,751.57, and the jury had awarded punitive damages of $500,000. *Id.* at 585. We concluded that that ratio of punitive damages at one and one-half times the actual and potential damages was permissible for moderately reprehensible conduct under the Due Process Clause without determining what the highest lawful amount of punitive damages would have been under those circumstances. *Id.* at 586.

In *Hamlin*, the defendant, the plaintiff's employer, refused to reinstate the plaintiff following an injury suffered in the course of employment despite the plaintiff's statutory right to reinstatement. 222 Or App at 232. In that case, we concluded that the defendant had acted with intentional malice against a financially vulnerable plaintiff. *Id.* at 241. Based on those two reprehensibility factors, on a comparison

of the circumstances in that case to the circumstances in *Vasquez-Lopez* and *Goddard,* and on the low level of economic damages ($6,000) incurred by the defendant, we concluded that the permissible ratio in that case was four times the compensatory damages. *Hamlin,* 222 Or App at 250.

*Strawn* was a class action case in which the defendant fraudulently denied medical insurance claims. As in *Hamlin,* we identified two reprehensibility factors involved in the defendant's conduct and determined that the defendant's misconduct was "moderately reprehensible." *Strawn,* 228 Or App at 483. In *Strawn,* the overwhelming majority of class members had damages resulting in relatively small money awards. *Id.* at 483 n 17. Under those circumstances, we again concluded that the permissible ratio was four times the compensatory damages. *Id.* at 485.

Based on our review of those cases, we conclude that, where FedEx's misconduct is less than moderately reprehensible, the maximum amount that a rational jury could have awarded under the circumstances of this case is three times the compensatory damages. Although we ultimately determined in *Hamlin* and *Strawn* that punitive damages in those cases could be awarded at four times the compensatory damages, it was the small amounts of the compensatory awards in those cases that justified that higher ratio. In addition, here, the level of reprehensibility of FedEx's misconduct is less than it was in *Hamlin* and *Strawn.*

The only reprehensibility factor that the jury was entitled to find on the record in this case is that the harm that FedEx caused to plaintiffs resulted from intentional malice, trickery, or deceit. That finding is predicated on Khut's misrepresentation that FedEx usually waives its contractual right to terminate contractors without notice, and on that fact that FedEx concealed its plan to terminate plaintiffs without notice by instructing Jones not to inform plaintiffs of that plan and by continuing to approve plaintiffs' investments to provide future services under the agreement. For that misconduct, the jury awarded compensatory damages of $350,000. Accordingly, based on our conclusion that the constitutional limit for punitive damages in this case is three times the award for compensatory damages, the constitutional limit for punitive damages in this case is $1,050,000.

## IV. CONCLUSION

In sum, the trial court erred in denying FedEx's motion for a directed verdict on the intentional interference with economic relations claim but did not err in denying FedEx's motion for a directed verdict on the fraud claim. The jury's award of punitive damages exceeds the amounts that are constitutionally permissible under the Due Process Clause.

Reversed as to denial of motion for directed verdict on intentional interference claim; remanded with instructions to grant defendant's motion for new trial limited to punitive damages unless plaintiffs agree to remittitur of punitive damages equal to three times their compensatory damages; otherwise affirmed.

**EDMONDS, P. J.,** concurring in part, dissenting in part.

I agree with the majority's holdings that the trial court erred by failing to grant a motion by defendant FedEx Ground Package System, Inc. (FedEx) for a directed verdict on plaintiffs' intentional interference with economic relations claim and that the trial court properly denied FedEx's motion for a directed verdict on plaintiffs' fraud claim. I also agree that the trial court erred when it declined to reduce the $7 million punitive damages award in light of FedEx's contention that the award was grossly excessive in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. My disagreement is with the majority's disposition providing that plaintiffs may file for remittitur in the amount of $1,050,000 as an alternative to a new trial on the issue of punitive damages. For the reasons that follow, the majority's interpretation of Article VII (Amended), section 3, is erroneous, and the proper disposition is a remand for a new trial on the issue of punitive damages.[1]

---

[1] Article VII (Amended), section 3, of the Oregon Constitution provides, in part:

"[N]o fact tried by a jury shall be otherwise re-examined in any court of this state, unless the court can affirmatively say there is no evidence to support the verdict."

Plaintiffs went to trial on claims against FedEx for breach of contract, intentional interference with economic relations, fraud, breach of the covenant of good faith and fair dealing, and promissory estoppel. The jury returned the following verdict:

"We, the jury, being first duly sworn, find:

"**1. Did defendant breach its contract with plaintiffs?**

"ANSWER: _____ NO _____ (yes or no).

"**2. Did defendant breach the duty of good faith and fair dealing that defendant owed plaintiffs under its contract with plaintiffs?**

"ANSWER: _____ YES _____ (yes or no).

"**3. Did defendant commit fraud?**

"ANSWER: _____ YES _____ (yes or no).

"**4. Did defendant intentionally interfere with plaintiffs' business relations with others?**

"ANSWER: _____ YES _____ (yes or no).

"**5. Did defendant make promises to plaintiffs, that defendant could reasonably foresee would be relied upon by the plaintiffs, and upon which plaintiffs actually relied to their detriment?**

"ANSWER: _____ YES _____ (yes or no).

"If you answered 'No' to questions 1, 2, 3, 4, and 5 your verdict is for defendant. Do not answer any further questions. The presiding juror should sign the verdict form.

"If any of questions 1, 2, 3, 4, and 5 were answered 'Yes,' at least the same nine jurors answering 'Yes' on any of questions 1 through 5 must also agree on the answers to all of the remaining questions to which you answer 'Yes' or to which you answer with a number.

"**6. What amount of compensatory damages are owed to plaintiffs, if any?**

"$ _____ $350,000.00 _____ .

"If your answer is $0, your verdict is for the defendant. Do not answer any further questions. The presiding juror should sign this verdict form.

"If your answer to question 6 is more than $0, at least the same nine jurors answering 'Yes' or with a number on any of questions 1 through 6 must also agree on the answers to all of the remaining questions to which you answer 'Yes' or to which you answer with a number.

"**7. If questions 3 or 4 were answered 'Yes,' did defendant act with malice or show a reckless and outrageous indifference to a highly unreasonable risk of harm and act with a conscious indifference to the health, safety and welfare of others?**

"ANSWER: _____YES_____ (yes or no).

"If your answer to question 7 is 'No,' do not answer any further questions. The presiding juror should sign this verdict form. If your answer to question 7 is 'Yes,' proceed to question 8.

"**8. What amount of punitive damages, if any, should be awarded to plaintiffs?**

"$ ___7,000,000.00___ ."

(Boldface in original.)

The judgment entered pursuant to the jury's verdict provides, in part:

"The jury heard the evidence admitted at trial, and the court and the jury heard the arguments of the parties. The jury returned a verdict on April 27, 2006, which included an award of compensatory and punitive damages to plaintiffs. The court received the verdict and entered it into the record.

"Pursuant to ORS 31.735, the Department of Justice of the State of Oregon is a judgment creditor as to a portion of the punitive damages award to which the Criminal Injuries Compensation Account is entitled under ORS 31.735(1)(b). This designation is subject to all statutory and constitutional objections available to plaintiffs.

"NOW, THEREFORE, IT IS HEREBY ORDERED AND ADJUDGED that the plaintiffs, Michael Wieber and

Intrepid Corporation, have judgment against the defendant, FedEx Ground Package System, Inc., for compensatory damages in the amount of $350,000 and for punitive damages in the amount of $2,800,000;

"IT IS HEREBY FURTHER ORDERED AND ADJUDGED that the State of Oregon, by and through the Criminal Injuries Compensation Account of the Department of Justice Crime Victims' Assistance Section, has judgment against defendant, FedEx Ground Package System, Inc., for punitive damages in the amount of $4,200,000[.]"

On appeal, FedEx makes three assignments of error: (1) the trial court erred by denying FedEx's motion for a directed verdict on the intentional interference claim; (2) the trial court erred by denying FedEx's motion for a directed verdict on the fraud claim; and (3) the trial court erred by denying FedEx's motion for a new trial based on the excessiveness of the punitive damages award. With respect to the fraud claim, FedEx argues on appeal that plaintiffs alleged that FedEx misrepresented to plaintiffs that it would give plaintiffs 30 to 45 days' notice before terminating its agreement with them. Accordingly, FedEx notes, with respect to punitive damages,

"[plaintiffs'] actual damages for fraud were, at most, the value of its routes and 45 days of lost profits. [Plaintiffs'] evidence at trial showed that [plaintiffs'] three routes had a combined value of between $150,000 and $180,000 and combined monthly profits of a little over $6000. If fraud provides the sole basis for the punitive award, the denominator of the ratio should be $190,000, not $350,000."

Also, with respect to the punitive damages award, FedEx states in its brief, "[I]f this court does not reject the punitive award altogether, it should reverse and remand with instructions to the trial court to remit the award to $350,000 or less or, if [plaintiffs] refuse such a remittitur, to order a new trial."

I agree with the majority that the evidence offered by plaintiffs was legally insufficient for their claim for intentional interference with economic relations to have been submitted to the jury and that their evidence pertaining to their fraud claim is the only evidence that could legally support a

punitive damages award. The majority errs, however, in affording plaintiffs the opportunity to file for remittitur in the amount of $1,050,000.

Under Oregon law, remittitur is available only when certain conditions are satisfied:

> "So, too, if it is manifest that an excessive judgment has been rendered, which is predicated upon an erroneous verdict, and this court, from an inspection of the record, is able to segregate the excess from the amount so found by the jury, it may, on condition that the respondent remits the excess, affirm the judgment for the balance; *otherwise a new trial will be ordered.*"

*Cochran v. Baker*, 34 Or 555, 557, 52 P 520; 56 P 641 (1899), *overruled in part on other grounds by Wehrung v. Denham*, 42 Or 386, 71 P 133 (1903) (emphasis added); *see also Daskalos v. Kell*, 280 Or 531, 544-45, 571 P2d 141 (1977) (remittitur, rather than new trial, was appropriate where "[t]he extent of any possible prejudice suffered by defendants as the result of such an [instructional] error" could be easily calculated as "the difference between the amount prayed for in Count III (the sum of $11,272.50) and the amount supported by plaintiffs' proof (the sum of $9,937), *i.e.*, the sum of $1,335.50"); *Ely v. Wilde*, 62 Or 111, 117, 122 P 1122 (1912) (holding that error with respect to calculation of damages "would necessitate a reversal of the judgment *but for the fact that the amount of that claim is definite and severable from the remainder of the judgment*" (emphasis added)); *Hagestrom v. Sweeney*, 60 Or 433, 436, 119 P 725 (1912) ("As the damages are found in a separate item of the verdict, the amount erroneously found is fixed, and we may affirm the judgment on condition that plaintiffs remit from the judgment the amount of [excess] damages."); *Mackey v. Olssen*, 12 Or 429, 430, 8 P 357 (1885) (holding that when the damages resulting from a trial court's error can be segregated from the amount of the verdict based on the record before the court, the judgment will be affirmed for the balance in the event that the plaintiff is willing to remit the amount of damages attributable to the error).

In this case, we cannot determine what amount of punitive damages should have been entered as a judgment in

the trial court as a matter of law. The amount of $1,050,000 constitutes the maximum permissible award under the Due Process Clause—*i.e.*, a ceiling on the amount that a jury could permissibly have awarded in this case in light of the compensatory damages award. But the constitutional upper limit on what the jury could award on remand does not inform what amount the jury actually would have awarded in this case had the claim for intentional interference with economic relations and the evidence offered pursuant to that claim not been erroneously submitted to the jury as part of its consideration of the amount of punitive damages. Stated otherwise, the record in this case does not permit this court to segregate any amount attributed by the jury to FedEx's fraudulent conduct from the $7 million punitive damage award that the jury made with respect to both the intentional inference with economic relations claim and the fraud claim. Under the above-cited precedents, a new trial on the issue of punitive damages is therefore required.

In concluding otherwise, the majority relies on Article VII (Amended), section 3, of the Oregon Constitution. According to the majority, that constitutional provision limits our review of a jury's award "to two considerations: whether *any* evidence supports the jury's finding that punitive damages should be awarded; and whether the amount of punitive damages is excessive in light of the Due Process Clause." 231 Or App at 487-88 (emphasis in original). It follows, in the majority's view, that "the Oregon Constitution does not provide authority for this court to further review the jury's award of punitive damages." *Id.* at 489.

The majority's interpretation of Article VII (Amended), section 3, incorrectly conflates the standard of review imposed by the constitutional provision in regard to the adjudication of error with the authority of this court to order a new trial in the event of error. *Id.* at 487. The initial error committed by the trial court was when it submitted the intentional interference with economic relations claim to the jury when there was no evidence that would support a finding that FedEx was a third party to any of plaintiff's relationships with his customers. Our standard of review regarding that claim of error under Article VII (Amended), section 3, is for "any evidence." Here, because there was no evidence that

FedEx was a third party to any of plaintiff's relationships with his customers, our reversal on that ground does not run afoul of Article VII (Amended), section 3. As a result of that error, the jury was improperly permitted to consider a theory of liability and the evidence supporting the theory in assessing both whether to award punitive damages and if so, what amount of punitive damages to award.

The trial court also committed another error when it refused to grant a new trial after the jury returned a constitutionally excessive award under the Due Process Clause. On appeal, the review of that error could not result in the reversal of the punitive damage judgment because the amount of punitive damages is a question of fact, and Article VII (Amended), section 3, prohibits an Oregon appellate court from reviewing a question of fact tried by a jury. However, reversal of the constitutionally excessive punitive damage judgment in this case is required under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Honda Motor Co. v. Oberg*, 512 US 415, 420, 114 S Ct 2331, 129 L Ed 2d 336 (1994). Consequently, under the federal Supremacy Clause, the judgment for $7 million in punitive damages must be reversed. *Oberg v. Honda Motor Co.*, 320 Or 544, 549, 888 P2d 8 (1995).

The remaining question is the proper remedy in light of both errors committed by the trial court. If the only error was the error committed under the Due Process Clause, the proper remedy would be to grant a new trial unless the nonmoving party agrees to the entry of an amended judgment reduced to a constitutionally permissible amount of punitive damages. *Parrott v. Carr Chevrolet, Inc.*, 331 Or 537, 559, 17 P3d 473 (2001). But this case involves two errors committed by the trial court and, because of that fact, that remedy is not available; rather, a new trial must be ordered in accordance with the rules of *remittitur* as referred to in the above paragraphs. Under those rules, a new trial is necessary because this court cannot determine as a matter of law what amount of punitive damages the jury would have awarded had the trial court not allowed it to consider the intentional interference with economic relations claim and the evidence admitted under that claim in assessing the amount of punitive damages.

Ordering a new trial under the above circumstances would not run afoul of Article VII (Amended), section 3, as the majority holds. Article VII (Amended), section 3, prohibits the reexamination of any fact tried by a jury. It does not prohibit an Oregon appellate court from reversing a trial court judgment and remanding for a new trial on the basis of an error of law. In this case, the error of law committed by the trial court was in submitting the claim for interference with economic relations and the evidence in support of the claim to the jury for its consideration regarding whether to award punitive damages, and, if so, in what amount, when there was no evidence that FedEx had any relationship with plaintiff's customers.

The cases cited by the majority in support of its holding are not to the contrary. In *Honda Motor Co.*, the United States Supreme Court remanded to the Oregon Supreme Court after the Oregon court ruled that Article VII (Amended), section 3, prevented Oregon trial and appellate courts from reviewing punitive damage awards because the assessment of punitive damages is a question of fact. 512 US at 435. On remand, the court held, as noted above, that, under the federal Supremacy Clause, the court was bound to follow the requirements of federal due process in light of the conflict between the provisions of Article VII (Amended), section 3, and the provisions of the federal constitution. *Oberg*, 320 Or at 549. Nothing in the holding in *Oberg* restricts the authority of this court under Article VII (Amended), section 3, to grant a new trial on the issue of punitive damages when legal error infects the trial process that led to the punitive damage award.

The majority also mistakenly relies on *Lakin v. Senco Products, Inc.*, 329 Or 62, 76, 987 P2d 463 (1999), for the proposition that Article VII (Amended), section 3, eliminated the authority of Oregon courts to grant new trials after an excessive damage verdict had been rendered by a jury. In *Lakin*, the plaintiffs were awarded compensatory and punitive damages. The trial court applied *former* ORS 18.560(1) (1987), *renumbered as* ORS 31.560 (2003) and entered judgment for each plaintiff for $500,000 in noneconomic damages. With respect to one plaintiff, the court reduced that amount

by five percent based on the jury's finding that he had contributed to his injuries. On appeal, the defendant raised claims of error regarding the trial court's evidentiary rulings, its jury instructions, its denial of a directed verdict, and its rulings pertaining to punitive damages. The plaintiffs cross-appealed, contending that *former* ORS 18.560 was unconstitutional in several respects. *Lakin*, 329 Or at 66-67.

On appeal, the principal issue in *Lakin* concerned the constitutionality of *former* ORS 18.560(1) and whether the legislature had the authority under the constitution to enact the statute. This court decided that issue under Article VII (Amended), section 3. *Lakin v. Senco Products, Inc.*, 144 Or App 52, 925 P2d 107 (1996). On review, the Supreme Court decided the issue under Article I, section 17, of the Oregon Constitution, which provides that, "In all civil cases the right of Trial by Jury shall remain inviolate." *Lakin*, 329 Or at 82. On review, the defendant relied on *dicta* in *Greist v. Phillips*, 322 Or 281, 906 P2d 789 (1995), in support of its contention that *former* ORS 18.560(1) did not violate Article I, section 17. The portion of *Greist* on which the defendant relied provides,

> "*Until* the adoption of Article VII (Amended), section 3, in 1910, trial courts were empowered to reduce jury awards of damages when the courts believed that those awards were excessive."

322 Or at 295 (emphasis in original). The *Lakin* court responded to the defendant's argument as follows:

> "The quoted *dicta* requires correction. Oregon trial courts never have had the power to reduce a jury's verdict or to enter judgment for a lesser amount of damages over the objection of the prevailing party, who always could reject a judicial remittitur and demand a new jury trial. *See Adcock v. Oregon Railroad Co.*, 45 Or 173, 181, 77 P 78 (1904) (in an action for personal injuries, the court may order a remission of part of the damages awarded by the jury, but only as a condition of overruling a motion for a new trial)."

329 Or at 76-77.

That quotation from *Lakin*—which the majority offers as support for the proposition that Article VII (Amended), section 3, eliminated Oregon trial courts' power

to grant new trials for excessive awards—must be understood in the context in which it appears. That context has nothing to do with whether this court has the authority to order a new trial on the issue of punitive damages where the trial court committed legal error by submitting an underlying claim to the jury that should not have been submitted.

It is correct that the assessment of punitive damages is a question of fact for the jury to decide. *Van Lom v. Schneiderman*, 187 Or 89, 116-17, 210 P2d 461 (1949) (Rossman, J., specially concurring). But no jury in this case has (1) determined whether punitive damages should be awarded or (2) assessed the amount of punitive damages on a record that does not contain a claim for intentional interference with economics relations and the evidence admitted pursuant to that claim. It follows that the majority's view that our review is limited to two considerations—whether any evidence supports the amount awarded and whether the amount of punitive damages is excessive in light of the Due Process Clause—is incorrect. Rather, the majority fails to take into account the error in submitting a claim to the jury that should not have been submitted. That circumstance means that the only available remedy is to remand for a new trial so that a jury can determine the issue of punitive damages on a proper evidentiary record.[2]

ORCP 64 B imposes an additional requirement for the grant of a new trial on the issue of punitive damages: the movant must establish that the trial court's ruling that was "against the law" materially affects the substantial rights of the party. ORS 19.415 parallels ORCP 64 B and provides, in pertinent part:

---

[2] The right to a new trial when legal error infects the judgment is underscored by the language in ORCP 64 B(5), which provides:

"A former judgment may be set aside and a new trial granted in an action where there has been a trial by jury of the motion of the party aggrieved for any of the following causes materially affecting the substantial rights of such party:

"* * * * *

"B(5) Insufficiency of the evidence to justify the verdict or other decision, or that it is against the law."

"(1) Upon an appeal from a judgment in an action at law, the scope of review shall be as provided in section 3, Article VII (Amended) of the Oregon Constitution.

"(2) No judgment shall be reversed or modified except for error substantially affecting the rights of a party."

*See also Jensen v. Medley,* 336 Or 222, 82 P3d 149 (2003) (applying statute); *Shoup v. Wal-Mart Stores, Inc.,* 335 Or 164, 61 P3d 928 (2003).

In *Shoup,* the Supreme Court applied ORS 19.415 in the context of a jury award in which one of three specifications of negligence was erroneously submitted to the jury. In that circumstance, the court held that, in order to demonstrate that the error had substantially affected its rights, the defendant was required to show that the jury had based its verdict on the invalid specification. Because the jury had returned a general verdict, the court could not tell which of the three specifications of negligence formed the basis for the jury's verdict, and the defendant did not identify anything in the record to demonstrate that the jury based its verdict on the erroneously submitted specification. Thus, the *Shoup* court held that the defendant was unable to show that the trial court's error substantially affected its rights, thereby precluding the court from reversing the judgment.

In *Jensen,* the issue was whether the defendant, an international union, could be held liable for the wrongful actions of an affiliated local union. A jury determined that the defendant was vicariously liable for the local union's violation of *former* ORS 659.550 (1991), *renumbered as* ORS 659A.230 (2001). It therefore returned a verdict for the plaintiff for noneconomic and punitive damages. On review, the Supreme Court held that the jury had been given an erroneous jury instruction. The plaintiff argued, however, that, even if the instruction was erroneous, the trial court had instructed the jury that it could find the defendant liable on the alternative ground that it had ratified the local union's actions. The Supreme Court agreed that, under *Shoup,* the defendant could not demonstrate reversible error for purposes of ORS 19.415; the verdict form did not distinguish between the theories on which the plaintiff had prevailed, and the defendant could not demonstrate that the verdict

was based on the erroneous instruction. *Jensen*, 336 Or at 240. Moreover, because the defendant did not challenge the jury's award of noneconomic damages on appeal, the court affirmed that award.

The defendant in *Jensen* also argued that the trial court should have granted its motion for a directed verdict with respect to punitive damages. According to the defendant, the alternative theory of ratification did not provide a sufficient basis for an award of punitive damages. In addressing that issue, the court explained:

> "Because of the conclusions that we reach above, we review the directed verdict motion by examining the record to determine only whether there is any evidence to support [the defendant's] ratification of the willful and wanton misconduct of [the local union and its business agent], not to determine whether there is evidence related to agency that would support the jury's decision to hold [the defendant] 'vicariously liable' for the misconduct of [the local union and its business agent]."

*Id.* at 241 (emphasis omitted). The court concluded that there was no evidence that the defendant had ratified the local union's actions or that the defendant was aware of the material facts at the time that the purported ratification took place. Consequently, the court held that the trial court had erred in denying the defendant's motion for a directed verdict on the claim for punitive damages and did not reach the parties' arguments concerning the amount of punitive damages. *Id.* at 242-43.

Neither ORS 19.415(2), *Shoup*, nor *Jensen* concerns the subject of remittitur. Indeed, the rule of remittitur as described above is a discrete rule of law from ORS 19.415(2) and its progeny and must be applied separately. A proper application of each rule to the circumstances of this case demonstrates why the rules differ in concept and why the majority errs in permitting plaintiff to file for remittitur.

FedEx is not entitled to a new trial under ORS 19.415(2) as to the award of compensatory damages despite the trial court's error in submitting the claim for intentional interference with economic relations to the jury. That result is required because the verdict form does not specify the

claim on which the compensatory damages award is based. Rather, the form instructs the jury to assess the amount of compensatory damages owed to plaintiffs if any of questions 1, 2, 3, 4, or 5 is answered "yes." Consequently, it is not possible from the verdict form to discern whether the jury awarded compensatory damages on the intentional interference with economic relations claim, the fraud claim, or both. Thus, a possible result, according to the verdict form, is that the jury intended to award the full amount of compensatory damages based on the evidence adduced pursuant to the fraud claim. Because that claim was properly submitted to the jury, FedEx is unable to demonstrate that its rights were substantially affected by the error of the trial court in submitting the intentional interference with economic relations claim to the jury. It necessarily follows that the trial court's error regarding the failure to grant the directed verdict motion on the intentional interference with economic relations claim does not require a new trial with regard to the award of compensatory damages, because FedEx cannot demonstrate that the error substantially affected its rights.

In contrast, however, to the award of compensatory damages by the jury, the same ambiguity in the verdict form requires that the award of punitive damages be reversed and that the case be remanded for a new trial on that issue. That result is required because this court cannot segregate from the $7 million punitive damage award what amount of the punitive damages should have been awarded to plaintiffs as a matter of law, as the rule of remittitur requires. ORS 19.415(2), *Shoup*, and *Jensen* have no relevance to the issue of remittitur. Their relevance concerns whether FedEx can demonstrate that its rights were substantially affected by the error that the trial court made in refusing to vacate the constitutionally excessive punitive damage. FedEx easily satisfies the "prejudicial error" test of ORS 194.15(2) in that respect because the punitive damage award exceeds the constitutionally permissive ceiling for an award by approximately $6 million. Thus, the only issue that remains is how to apply the rule of remittitur correctly, which, for the reasons discussed above, the majority fails to accomplish.

In sum, this case must be remanded for a new trial on the issue of punitive damages because we are unable to

segregate any properly awarded amount of punitive damages from the jury's $7 million award.

For that reason, I dissent, in part.